# EXHIBIT A

# NEW YORK CASH ACCOUNT ADVANTAGE® ADJUSTABLE RATE REVERSE MORTGAGE LOAN ACCOUNT DISCLOSURE STATEMENT AND AGREEMENT

DATE: **JULY 23, 2008** LOAN NO [redacted]

LENDER ("YOU" AND "YOUR" REFER TO LENDER):
**FINANCIAL FREEDOM SENIOR FUNDING CORPORATION , A SUBSIDIARY OF INDYMAC BANK, F.S.B.**
**192 TECHNOLOGY PKWY, SUITE 100**
**NORCROSS, GEORGIA 30092**

This is to certify this is a true and correct copy of the original instrument

BORROWER(S) ("I", "ME", "MY" AND "MINE" REFER TO BORROWER(S)):
Borrower(s): **RITA RAAB**

Address: **2434 E 66TH ST, BROOKLYN , NEW YORK 11234**

| | | |
|---|---|---|
| **Initial Advance Limit:** | | $ 543,950.00 |
| | | |
| Initial Index Rate: | | 3.1% |
| Margin: | | 3.75000% |
| *Initial* ANNUAL PERCENTAGE RATE: | | 6.8500% |
| Initial Daily Periodic Rate: | | .0173% |
| | | |
| Maximum ANNUAL PERCENTAGE RATE: | | 12.8500% |
| Initial Discounted Interest Rate: | | 6.3500% |
| (Effective until the first Rate Change Date) | | 01/01/09 |
| Monthly Servicing Fee: | | $ 20.00 |

Title and property insurance are required to obtain this loan. I may obtain this insurance from anyone acceptable to you. If I do not keep required property insurance in force, you may obtain it and add the cost to my balance.

| Initial Advance | | A FINANCE CHARGES | | B Other Charges | |
|---|---|---|---|---|---|
| Cash to Borrower | $ 103,330.20 | Origination Fee | $ 10,879.00 | Appraisal | $ |
| Repairs | $ | Loan Processing | $ | Title Insurance | $ 3,156.00 |
| Lien payoff | $ 423,404.80 | Tax Service Fee | $ 45.00 | Credit Report | $ |
| **FINANCE CHARGES** (A) | $ 11,914.00 | Flood Cert. Fee | $ | Notary Fee (est.)* | $ 300.00 |
| Other Charges (B) | $ 4,821.00 | Closing Fee | $ 900.00 | Wire Transfer Fee | $ 350.00 |
| Recording Fee | $ 480.00 | Delivery (est.)* | $ | Title Endorsements | $ 100.00 |
| | | Inspection | $ | title exam: | $ 450.00 |
| | | Doc. Prep. | $ 90.00 | deed | $ 465.00 |
| | | Broker Fee | $ | | |
| | | Counseling Fee | $ | | |
| | | | $ | | |
| | | | $ | | |
| | | | $ | | |
| **TOTAL Initial Advance** | $ 543,950.00 | **TOTAL** | $ 11,914.00 | **TOTAL** | $ 4,821.00 |

**Where a charge is estimated (est.) above, the Closing Statement delivered at closing will indicate the exact charge.*



[redacted]

[redacted]

This loan is secured by a Deed of Trust, Mortgage or Security Instrument dated **JULY 23, 2008** (the "Security Instrument") on real estate located at my address above (the "Property").

This Agreement covers the terms and conditions of a Cash Account Advantage Adjustable Rate Reverse Mortgage Loan Account (the "Account"). I will read it carefully, ask questions and, if I agree to be bound by this Agreement, I will sign below. If more than one person signs, each will be responsible for repaying all sums advanced or incurred under this Agreement. To the extent that terms in this Agreement are capitalized, those terms either are defined in the sections in which they appear, or have the meaning in the context in which they appear or are disclosed on page 1 of this Agreement.

This Agreement is an open-end line of credit. This means that I can borrow amounts ("Advances") up to my Advance Limit, as it may be adjusted from time to time as described in Section 1.2 below, repay them and then later re-borrow, subject to the terms of this Agreement. I can obtain funds from my Account (up to my Advance Limit, as it may be adjusted from time to time) by using the Advance request forms you supply me. I may also obtain funds (up to my Advance Limit, as it may be adjusted from time to time) by writing to you and including my name, loan number and amount requested.

**1 ADVANCES.**

**1.1 Credit Limit.** My Credit Limit is equal to the Advance Limit specified on the first page of this Agreement, as it may be adjusted from time to time as described in Section 1.2 below, plus all other amounts advanced by you to me or for my Account under this Agreement, all interest accrued thereon, and all other fees and charges incurred under this Agreement or under the Security Instrument. The Security Instrument securing this Agreement will not secure any amount in excess of the Credit Limit. The Initial Advance against the Advance Limit will be an amount equal to the sum of the Cash to Borrower, Repairs and Lien payoff amounts, plus the FINANCE CHARGES, the "Other Charges", and the Recording Fee, all as indicated on the first page of this Agreement. Thereafter, the minimum Advance will be five hundred dollars ($500) unless the Advance Limit is less than $500, in which case, the remaining Advance Limit may be withdrawn.

**1.2 Adjustment of Advance Limit.** To the extent that I repay Advances, or do not take Advances my Advance Limit will increase as described below. My new Advance Limit will be calculated as follows:

During the first year, beginning on the date of this Agreement and until the second Rate Change Date (as described in Section 3.5 below) my Advance Limit will be equal to the Initial Advance Limit specified on the first page of this Agreement. Thereafter, until a Maturity Event occurs, my Advance Limit will be increased annually on the first day of the next billing cycle following the anniversary date of this Agreement by an amount called the "Advance Limit Adjustment". To calculate the Advance Limit Adjustment, you take my then current Advance Limit, subtract all previous Advances (including amounts advanced by you under Section 15 of this Agreement) and add all repayments of principal on Advances made since my Account was established, and multiply the total by five percent (5%, or 0.05). This is the Advance Limit Adjustment. The Advance Limit Adjustment is then added to my previous Advance Limit, which gives you the new Advance Limit. The portion of my new Advance Limit which I can borrow, which is the amount of credit available to me, is equal to my new Advance Limit, less all previous Advances, plus all previous repayments of principal on Advances.

The Maximum Principal Sum specified on the first page of the Security Instrument is the maximum Advance Limit possible under this Agreement.

**1.3 Advances.** From the date of this Agreement until a Maturity Event occurs (see Section 6 below), I may obtain Advances from you upon written request, subject to Sections 5 and 13 below. I may use the Advances for any purpose, except I cannot use them to pay any amounts I owe under this Agreement. If I request an Advance in an amount less than $500 (my minimum Advance) or in an amount that would cause me to exceed my Advance Limit, you are not obligated to honor any such request. I agree to notify you immediately if any of my Advance request forms are lost or stolen, or if anyone who has not signed this Agreement as a Borrower obtains or attempts to obtain funds from my Account. Absent such notice you may assume the signature on any Advance request form you receive with respect to my Account to be genuine, without need to verify the authenticity of the signature.

**1.4 Termination or Change of Agreement.** Under certain circumstances, and as specified below, you can (a) terminate this Agreement, require that I pay you the entire outstanding balance in one payment, and charge me certain fees; (b) refuse to make additional extensions of credit; (c) reduce my Advance Limit; and (d) implement certain changes to this Agreement.



[redacted]

[redacted]

**1.5 Suspension or Termination of Advances.** You may refuse to make additional extensions of credit or reduce my Advance Limit if (1) you reasonably believe that a Maturity Event has occurred, or (2) you are precluded by government action from imposing the Annual Percentage Rate provided for in this Agreement, or (3) government action adversely affects the priority of your security interest under the Security Instrument such that the value of your security interest is less than 120% of my Credit Limit, or (4) an Event of Default occurs as described in Section 13 and is continuing.

**1.6 Initial Advance.** The first Loan Advance will be made as soon as (but not sooner than) such advance is permitted by law. The law gives Borrower a right of rescission to cancel the Loan. If Borrower rescinds and cancels the Loan, no Loan Advance will be made. If Borrower does not cancel and keeps the Loan, the first Loan Advance will be made at the end of the period during which Borrower can rescind the Loan.

**1.7 Mandatory Loan Advances.** Notwithstanding anything in Sections 1.3, 5 or 13, any Loan Advances made by Lender under Sections 3.3 (When Finance Charges Begin to Accrue), 7 (Servicing Fee), 8 (Other Charges), and 15 (Protection of Lender's Rights in Property) shall be considered mandatory Loan Advances. These Loan Advances may be made by Lender even though the Loan is due and payable, or I am in default, or Lender can stop making other Loan Advances to me.

**2 PAYMENTS.**

**2.1 Promise to Pay.** I promise to pay when due all amounts advanced under this Agreement, all Finance Charges and all other charges to my Account authorized under this Agreement or the Security Instrument, at your address indicated on the first page of this Agreement.

**2.2 Prepayment.** Payments may be made before they are due ("Prepayments") in amounts of $100 or more. Although I have no obligation to repay any Advances or any interest accrued thereon before a Maturity Event occurs (unless an Event of Default occurs under Section 13 of this Agreement and you accelerate my Account and require early repayment), I can prepay my Account balance in full or in part, without penalty, at any time before the balance is due. I understand that to prepay the Account in full, I have to pay the principal amounts borrowed under this Agreement, all accrued interest, and all other fees and charges, and that I must instruct you in writing to terminate my Account.

**2.3 Application of Payments.** You will apply partial Prepayments first to reduce principal amounts borrowed under this Agreement, then to accrued interest, and then to all other fees and charges which I may owe under this Agreement. All payments received after a Maturity Event or acceleration has occurred, or in connection with a prepayment in full of the Account, will be applied first to principal amounts borrowed under this Agreement, then to all other fees and charges which may be owed under this Agreement, then to accrued interest.

**2.4 No Waiver.** You may accept partial payments marked "Payment in Full" (or similar words) without losing your rights under this Agreement, including the right to obtain full payment of the amount owed.

**3 FINANCE CHARGE.**

**3.1 Calculation of Finance Charge.** The Finance Charge is the sum of (a) the Periodic Finance Charge and (b) the other Finance Charges listed on the first page of this Agreement. The Periodic Finance Charge is computed on my Average Daily Balance (including current transactions) for each billing cycle. To compute the Average Daily Balance you take the beginning balance of my Account each day (including any unpaid Finance Charges), add new Advances and other charges and subtract any payments and other credits. This gives you the daily balance. All daily balances in the billing cycle are then added together and divided by the number of days in the billing cycle. This is the Average Daily Balance. The Average Daily Balance is multiplied by the Daily Periodic Rate times the number of days in the billing cycle. The total is the amount of the Periodic Finance Charge. The total Periodic Finance Charges charged under this Agreement shall not exceed the Maximum Annual Percentage Rate as disclosed on the first page of this Agreement. This limitation does not include and does not apply to the Origination Fee, as well as any other charges as disclosed on the first page of this Agreement, nor does it apply to the monthly servicing fee.

**3.2 Addition of Finance Charges to Account Balance.** The Periodic Finance Charge will be added to my Account balance as of the last day of the billing cycle, and then will itself bear interest at the Daily Periodic Rate. This provision, therefore, provides for compound interest.



[redacted]

[redacted]

**3.3 When Finance Charges Begin to Accrue.** The Periodic Finance Charge at the Daily Periodic Rate will begin the date any Advance or charge is posted to my Account. There is no "free ride period". A one-time Origination Fee, if applicable, and other prepaid finance charges in the amount disclosed on the first page of this Agreement will be assessed at the time I open my Account. The Periodic Finance Charge will continue to accrue at the variable rate described below both before and after any Maturity Event and before and after any judgment is obtained, until all amounts owed under this Agreement are paid in full.

**3.4 Variable Rate.** The Annual Percentage Rate and corresponding Daily Periodic Rate used in determining my Finance Charge will be a variable rate, which may change semi-annually. Except as provided below in paragraph (a) of this Section, the Annual Percentage Rate will be the sum of the Index rate plus **THREE AND 750/1000** percentage points ( **3.75000** %) (the "Margin"), and the Daily Periodic Rate will be the Annual Percentage Rate divided by 365. The Annual Percentage Rate includes only interest (Finance Charge) and no other costs.

(a) Initial Discounted Interest Rate: My initial interest rate will be a discounted rate. This means that the interest rate beginning on the date my Account is opened will be lower than it would have been if it were based on the Index plus Margin. As a result of the discounted initial interest rate, my rate likely will increase upon the First Change Date even if the Index rate decreases. My Initial Discounted Interest Rate is set forth on the first page of this Agreement.

**3.5 Rate Change Date.** The initial Daily Periodic Rate and the initial ANNUAL PERCENTAGE RATE are both listed on the first page of this Agreement. After my Account is opened, the Annual Percentage Rate may change on the first day of the billing cycle beginning on or after **JANUARY, 2009** and on the first day of every sixth billing cycle thereafter. Each day on which my Annual Percentage Rate could change is called a "Rate Change Date."

**3.6 Index.** Beginning with the first Rate Change Date, the Annual Percentage Rate on my Account will be adjusted to equal the Current Index plus the Margin. The most recent Index rate available as of the last business day immediately preceding the Change Date is called the "Current Index." The Index rate applicable to my Account will be the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. If the Index becomes unavailable, you will choose a new Index and Margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and Margin will result in an Annual Percentage Rate that is substantially similar to the rate in effect at the time the original Index becomes unavailable. You will provide me with written notice of the unavailability of the original Index, and of the new Index and its effective date.

**3.7 Increase in Index.** The new Annual Percentage Rate will apply to new Advances and charges, and to the existing unpaid balance of my Account. An increase in the Index rate may increase the Annual Percentage Rate, the Finance Charge, the Average Daily Balance and the amount of the payment, which will become due on my Account.

**3.8 Maximum Annual Percentage Rate.** The Annual Percentage Rate can change semi-annually. My interest rate will never be greater than **TWELVE AND 850/1000** percent ( **12.850** %). Maximum Annual Percentage Rate that could apply is listed on the first page of this agreement. The Initial Discounted Interest Rate is not taken into account in calculating the Maximum Annual Percentage Rate limitation. Except for this "cap", there is no limit on the amount by which the rate can change.

My interest rate will never be greater than **TWELVE AND 850/1000** percent ( **12.850** %).

**4 BORROWER'S WARRANTIES.**

I understand that your willingness to enter into this Agreement and to lend me the amounts it calls for both now and in the future is based upon your reliance upon certain statements I make to you set forth below being and continuing to be true, and that if they were not true, you would not agree to make any Advance to me. The statements on which you are relying are as follows, and I understand that by signing this Agreement I am stating that all of them are true, and at the time of any future Advance continue to be true:

- I and all persons signing the Security Instrument own the Property in fee simple absolute; no other person has any ownership interest in the Property except the persons signing the Security Instrument. I have the right to grant and convey the Property, and the Property is unencumbered (not subject to any liens, easements or rights of others) except for liens that are acceptable to you and liens securing debt to be repaid from the Initial Advance.



[redacted]

[redacted]

- I use the Property as my principal residence.
- I have not entered into any pending contract to sell or encumber the Property.
- The Property is insured with fire, extended coverage, flood (if the Property is in a flood plain or flood insurance is otherwise required) and all risk insurance and other insurance as you may require, issued in amounts and by an insurer that are acceptable to you.
- I have not caused or permitted the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property, and I have not done, nor allowed anyone else to do, anything affecting the Property that violates any Environmental Law. The preceding sentence does not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate to normal residential uses, as distinct from commercial uses, and to maintenance of the Property. The terms "Hazardous Substances" and "Environmental Law" are defined in the Security Instrument, and their definitions are incorporated into this Agreement.
- I know of no litigation or claim, pending or threatened against me or the Property that may affect your rights under this Agreement or the Security Instrument.
- Except as I have previously advised you in writing, all improvements to the Property are within the legal boundaries of the Property and have been constructed pursuant to validly issued and outstanding building permits and are in compliance with applicable building codes.
- I have paid when due all taxes, fees and assessments relating to the Property.
- No part of the Property has been leased or rented except as permitted in Section 5 below.

5 **BORROWER'S MATERIAL OBLIGATIONS.**

I understand that your willingness to enter into this Agreement and to lend me the amounts it calls for both now and in the future is also based upon my meeting certain material obligations which I undertake in this Agreement, and that if I do not promise to meet these material obligations you will not make any Advances. I also understand that if I do not meet these material obligations you may suspend my borrowing privileges under this Agreement, declare me in default under this Agreement, or both. These material obligations are set forth below, and by signing this Agreement each Borrower is agreeing to meet them:

- I promise to fulfill all of my obligations described in this Agreement and in the Security Instrument.
- I will, at my expense, keep the Property in at least the same condition as it exists on the later of the date of this Agreement or the date upon which all repairs, if any, funded by you from the Initial Advance are completed. I will not destroy or damage the Property, allow it to deteriorate or commit waste on the Property. I will notify you promptly of any destruction to the Property and of any condemnation or eminent domain proceedings initiated which may adversely affect the Property.
- I will permit you or your representative to visit and walk through the Property on reasonable prior notice (at least 24 hours). This might happen at intervals of one year or more, or less should circumstances warrant it.
- I will notify you beforehand (if possible and, if not, as soon as reasonably practicable) if I will be absent from the Property for more than 60 consecutive days or a total of 180 days in any 365-day period, and make arrangements satisfactory to you for the care and maintenance of the Property during periods of my absence.
- I will not lease or rent all or any part of the Property without your prior written consent, <u>except</u> that I may rent living space to a single tenant, either an individual or a family, on a month-to-month basis for so long as I continue to use the Property as my principal residence.

6 **SCHEDULED EXPIRATION UPON MATURITY EVENT.**

All amounts owed under this Agreement become due and payable in the ordinary course and without acceleration upon the first occurrence of a Maturity Event described below, unless I default under this Agreement and you accelerate my Account and require earlier repayment. I understand that after a Maturity Event occurs I will no longer be able to obtain Advances. I must repay the outstanding balance in one large or "balloon" payment upon the occurrence of a Maturity Event or, if sooner, when you accelerate my Account.

**Since regular periodic payments are not required under this Agreement and the finance charges that accrue, as well as the Monthly Servicing Fees and other amounts I may owe under this Agreement (see, for example, Sections 7 and 8 below), are added to my Account, "negative amortization" will occur. Negative amortization will increase the amount I owe you and reduce my equity in the Property.**



[redacted]

[redacted]

I will notify you immediately in writing when a Maturity Event occurs, or make provision to have any administrator, devisee, estate, executor, heir, legatee or personal representative of mine who is living and duly appointed as such do so if I am not then living. I understand that if all amounts I owe under this Agreement and the Security Instrument are not repaid to you on or before the date upon which they become due, you may exercise any of the remedies available to you in the Security Instrument.

The Maturity Events are:

- The sale, conveyance, transfer or assignment of all or any part of the Property, or any of my rights in the Property, whether voluntarily or involuntarily, by operation of law or otherwise, to a person other than any of the original Borrowers, without your prior written consent ("Due on Sale").

- My death or, if there is more than one Borrower, the death of the last living Borrower; *provided*, however, that if my administrator, devisees, estate, executors, heirs, legatees or personal representative, as the case may be, agree(s) with you in writing within thirty (30) days after the death of the last living Borrower to cooperate fully with you in selling the Property, including listing the Property for sale, caring for the Property and making any necessary repairs to the Property prior to its sale, then repayment of the Account will not be due until six months after the death of the last living Borrower, or such other date as may be provided in that written agreement, during which time interest on the Account will continue to accrue at the rate specified in this Agreement.
- All Borrowers ceasing to use the Property as their principal residence. For example, if I do not use the Property as my living and sleeping quarters for 60 consecutive days, or for a total of 180 days in any 365-day period, without in either case notifying you of my absence and making arrangements satisfactory to you to care for the Property while I am gone, you will consider me to have ceased using the Property as my principal residence, and a Maturity Event will be considered to occur on the last day of the 60-day or 180-day period, as applicable.

I will notify you in writing at least fifteen (15) days before any sale, conveyance, transfer or assignment of the Property, in order to permit you enough time to prepare any demands, releases or other documents you may consider necessary or appropriate, in your discretion.

**7 MONTHLY SERVICING FEE.**

I agree to pay a Monthly Servicing Fee in the amount disclosed on the first page of this Agreement. The Monthly Servicing Fee will be assessed on the first day of each month following the month in which the Initial Advance is made, and will be charged to my Account on each such date.

**8 OTHER CHARGES.**

You may assess the "Other Charges" disclosed on the first page of this Agreement at the time my Account is opened or as these charges are reasonably incurred at a later date. In addition, and except as limited by applicable law, you may assess your standard reconveyance or release fees, and all related recordation costs at the time of reconveyance or release.

**9 BROKER.**

No one has performed any act as broker for the Loan and no fees have been or are agreed to be paid by you or me to any broker except as indicated below:

**Name:**
**Address:**
**Fees paid or payable by me:**
**Fees paid or payable by you:**
**License No:**

**10 SECURITY.**

The indebtedness this Agreement evidences is non-recourse (which means that you may not use or attach any of my other assets or property to satisfy the Loan obligation) and is secured solely by the Security Instrument in favor of you, as beneficiary, from me, as trustor, covering the Property. All covenants, conditions and agreements contained in the Security Instrument are by this provision made a part of this Agreement to the same extent and with the same force and effect as if they were fully set forth in this Agreement. I acknowledge having received a copy of the Security Instrument.



[redacted]

[redacted]

**11 CERTIFICATION BY BORROWER.**

By accepting an Advance under this Agreement, I will be certifying to you (i) that no Maturity Event or Event of Default has occurred and that I have met all of my material obligations under Section 5 of this Agreement, and (ii) that my warranties described in Section 4 above continue to be true and correct.

**12 CHANGE OF TERMS.**

You may change the terms of this Agreement if I consent in writing or if the changes benefit me or are not material. Prior written notice will be given to me when required by law. Changes may apply to both new balances and existing unpaid balances unless prohibited by applicable law.

**13 DEFAULT.**

I understand that if any of the following events ("Events of Default") occurs and is continuing, I will be in default under this Agreement: (1) I engage in any fraud or make any material misrepresentation in connection with this Agreement; or (2) I do not meet my material obligations under this Agreement; or (3) I act in a manner that adversely affects the Property or your rights in the Property; or (4) I default under any term of the Security Instrument securing this Agreement, and such default adversely affects the Property or your rights in the Property; or (5) I (a) admit in writing my inability to pay debts or (b) make an assignment for the benefit of creditors or (c) file a voluntary petition in bankruptcy, or effect a plan or other arrangement with creditors or liquidate any assets under court supervision, or (d) have an involuntary petition in bankruptcy filed against me that is not discharged within 60 days after it is filed or (e) apply for or permit the appointment of a receiver, trustee or custodian for any of my property or assets who is not discharged within 60 days after the date of appointment; *provided*, however, that the appointment of a conservator, guardian, committee or other fiduciary of the person to act on my behalf in connection with a determination by a court or licensed physician that I am incompetent or lack capacity will not, by itself, be considered an Event of Default; or (6) any forfeiture action or proceeding, whether civil or criminal, is begun which in your good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by the Security Instrument or your security interest; or (7) the enactment, creation or expiration of applicable laws has the effect of rendering any material provision of this Agreement or the Security Instrument unenforceable according to its terms, as determined by you, and I refuse within sixty (60) days after your request to amend this Agreement and the Security Instrument so as to cure such unenforceability.

If an Event of Default occurs you may terminate my borrowing privileges under this Agreement, declare all sums immediately due and payable, foreclose upon the Property and apply the proceeds to the outstanding balance owed. Any foreclosure on the Property will be conducted in accordance with all requirements of applicable law, including any notice and right to cure requirements. Unless prohibited by applicable law, I will pay your reasonable attorneys' fees and court costs plus your other costs and expenses to realize on any security or collect the debt.

**14 CREDIT INFORMATION.**

My signature on this Agreement authorizes you, from time to time during the term of this Agreement and at no cost to me, to request and obtain a consumer report from a consumer-reporting agency.

**15 PROTECTION OF LENDER'S RIGHTS IN PROPERTY.**

If I fail to meet any of my material obligations in this Agreement or any of my obligations in the Security Instrument, or legal proceedings are commenced that may significantly affect your rights in the Property (such as proceedings in bankruptcy, probate, for condemnation or to enforce laws or regulations), then you may, but are not obligated to, do or pay for whatever is necessary to protect the value of the Property and your rights in the Property. This may include, for example, paying the cost of maintaining the Property during my absence; paying for taxes, maintenance, repair, insurance, or other items; and discharging liens, appearing in court and paying reasonable attorneys' fees. Any payments you make will not create an obligation to make any further payment.

If you do make such payments, the amount of the payments will be treated as an Advance under this Agreement and added to the balance of my Account, and will reduce my Advance Limit by an equal amount. Any amounts so paid and added to the balance of my Account will bear interest from the date of disbursement at the interest rate applicable to Advances, and will be secured by the Security Instrument and have priority as if made on the date of the Security Instrument.



[redacted]

[redacted]

## 16 ATTORNEYS' FEES.

If you or I fail to meet our obligations under this Agreement or the Security Instrument, and the other of us succeeds in enforcing that document in an arbitration or a legal proceeding, the losing party must pay the prevailing party, on demand, the latter's reasonable attorneys' and expert witnesses' fees and expenses and all other reasonable costs it incurred in connection with the arbitration or legal proceeding.

## 17 MISCELLANEOUS.

17.1 **Notice.** Any notice to me described in this Agreement or in the Security Instrument will be given by private delivery service or by mailing it by first class mail, postage prepaid, unless applicable law or the terms of this Agreement or the Security Instrument require using another method. The notice will be directed to the Property address or any other address all Borrowers designate to you in writing. I understand that any notice to you must be given by private delivery service or by first class mail, postage prepaid, to your address stated in this Agreement or any other address you designate to me in writing, unless applicable law or the terms of this Agreement or the Security Instrument require using another method. Any notice given by private delivery service in this way will be considered to have been given when delivered, and any notice given by mail in this way will be considered to have been given five (5) business days after being deposited in the mail.

17.2 **Transfer of Lender's Rights and Obligations.** I understand that you may at any time sell, transfer or assign to any person or persons all or any of your rights or obligations under this Agreement. The person or persons to whom any such sale, transfer or assignment is made will have the right to cure any of your failures to perform under this Agreement, but will not be required to do so. Your assignment of this Agreement solely as collateral will not cause the assignee to become liable for the performance of your agreements and obligations under this Agreement. If any such sale, transfer or assignment is to any person or persons who are financially responsible at the time of such sale, transfer or assignment, and who unconditionally assume all of your agreements and obligations under this Agreement, you will no longer be obligated to me under this Agreement.

I will cooperate with you in effecting any such sale, transfer or assignment and will provide you or any transferee or prospective transferee with all documents, information and signatures you reasonably require, including a certificate signed by me certifying the amount of money you have advanced to me and any other matters you may reasonably require. You may forward to any such transferee or any prospective transferee all documents and information which you now have or later may acquire relating to me and the Account, whether furnished by me or otherwise, as you determine to be reasonably necessary.

17.3 **Refund of Excess Interest.** If any law which applies to this Agreement and which sets maximum loan charges is finally interpreted so that the interest or the loan charges collected or to be collected in connection with this Agreement exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums I have already paid which exceeded permitted limits will be refunded to me. You may choose to make this refund by reducing the principal amount I owe hereunder or by making a direct payment to me. If a refund reduces such principal amount, the reduction will be treated as a Prepayment under this Agreement. (See Section 2.3 above).

17.4 **Waiver by Lender.** You may, if you wish, waive or delay enforcing your rights under any term or condition of this Agreement or under applicable law. Any such delay or waiver of a term or condition will not be considered a waiver of any other term or condition under this Agreement or any of your rights under applicable law.

17.5 **Waivers by Borrower.** I hereby waive my rights to:

1) presentment (formal presenting of this Agreement or a bill or invoice for payment); notice of dishonor (notice that a payment I have made has been refused); demand (request to make payment); protest (to declare that an amount due and owing is disputed in order to preserve my right to recover or reclaim the amount);
2) any release or discharge arising from any extension of time (to claim that your acceptance of a late payment gives me the right to avoid payment of late charges, penalties, *etc.*, lets me stop payments, or lets me change either the date a payment is due or the time frame within which I may be considered to have defaulted if a payment or other performance is not made when due);
3) release of any or all of the security for this Agreement except upon payment in full of my Account obligations; and



[redacted]

[redacted]

4) any other release or discharge other than upon actual payment in full.

*Even though I am giving up these rights, I understand that you must still give me written notification of any Event of Default and, if my Account becomes due and payable, a statement of my Account balance, before any foreclosure proceedings are commenced.*

**17.6 Set-Off.** I understand that I have no right of set-off under this Agreement. This means I have no right to hold back any money or payments to compensate for money that I believe you owe me.

**17.7 Entire Agreement; Amendment.** This Agreement and the Security Instrument contain the entire agreement between you and me with respect to amounts which may be due hereunder or under the Security Instrument, all prior understandings and agreements, whether written or oral, being merged into this Agreement and the Security Instrument and superseded by them. Neither this Agreement nor the Security Instrument may be amended unless you and I agree to the amendment in writing.

**17.8 Severability.** If any provision or clause of this Agreement or the Security Instrument conflicts with applicable law, that conflict will not affect other provisions of this Agreement or the Security Instrument which can be given effect without the conflicting provision. To this end, the provisions of this Agreement and the Security Instrument are declared to be severable.

**17.9 Remedies Cumulative.** All of your remedies under this Agreement are cumulative to any other right or remedy under this Agreement or the Security Instrument or afforded by law or equity, and may be exercised concurrently, independently or successively.

**17.10 Tax Advice.** I understand that a tax advisor should be consulted regarding the deductibility of interest and charges under this Agreement.

**17.11 Counterpart Execution.** If this Agreement is in counterparts (more than one signed original), all counterparts shall together constitute one single Agreement.

**18 GOVERNING LAW.**

This Agreement and the Security Instrument will be governed by the laws of the state in which the Property is located (without regard to its rules pertaining to conflict of laws) and by applicable federal law.

**19 FURTHER ACTS.**

I agree to execute and deliver to you all additional documents and I agree to do such other acts and things, reasonably necessary to correct any mistakes, to clarify the terms of the Loan, to clarify your rights or remedies, or to permit you to enforce your rights or remedies.

**20 NEW YORK LIEN LAW.**

I will receive all amounts lent to me by you subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date the Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, I will: (a) hold all amounts which I receive and which I have a right to receive from you under this Loan Agreement as a "trust fund"; and (b) use those amounts to pay for that construction or work before I use them for any other purpose. The fact that I am holding those amounts as a "trust fund" means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section.



[redacted]

[redacted]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

BORROWER:

(Borrower) RITA RAAB — Date 7-23-08

(Borrower) — Date

(Borrower) — Date

(Borrower) — Date

(Borrower) — Date

(Borrower) — Date

(Borrower) — Date

(Borrower) — Date

PAY TO THE ORDER OF

WITHOUT RECOURSE

Financial Freedom Senior Funding Corporation,
A Subsidiary of IndyMac Bank, F.S.B.

Brenda Phillips, Vice President

[redacted]

[redacted]

# MY BILLING RIGHTS
# THIS NOTICE IS TO BE KEPT FOR FUTURE USE

This notice contains important information about my rights and your responsibilities under the Fair Credit Billing Act.

**Notice to You in Case of Errors or Questions About My Periodic Statement**
If I think my Periodic Account Statement ("Statement") is wrong, or if I need more information about a transaction referred to on my Statement, I should write you on a separate sheet at the address listed on my Statement. I should write to you as soon as possible. You must hear from me no later than 60 days after you send me the first Statement on which the error or problem appeared. I can telephone you, but doing so will not preserve my rights.

In my letter, I need to give you the following information:

- My name and Account number;
- The dollar amount of the suspected error; and
- A description of the error and an explanation, if I can provide one, of why I believe there is an error. If I need more information, I will describe the item I am not sure about.

**My Rights and Your Responsibilities After You Receive My Written Notice**
You must acknowledge my letter within 30 days, unless you have corrected the error by then. Within 90 days, you must either correct the error or explain why you believe the Statement was correct.

After you receive my letter, you cannot try to collect any amount I question, or report me as delinquent. You can continue to reflect in my Statement the amount I question, including finance charges, and you can apply any unpaid amount against my Credit Limit. I do not have to pay any questioned amount while you are investigating, but I am still obligated with respect to the parts of my Statement that are not in question.

If you find that you made a mistake on my Statement, I will not have to pay any finance charges related to any questioned amount. If you did not make a mistake, I understand that I may have to pay finance charges. In either case, you will send me a Statement setting forth the amount I owe and the date it is due.

If I fail to pay the amount that you think I owe when my Account becomes due for repayment, you may report me as delinquent. However, if your explanation does not satisfy me and I write to you within ten days telling you that I still refuse to pay, you must tell anyone you report me to that I have a question about my Statement. And, you must tell me the name of anyone you reported me to. You must tell anyone you report me to that the matter has been settled between us when it finally is settled.

If you do not follow these rules, you cannot collect the first $50 of the questioned amount, even if my Statement was correct.



[redacted]

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2008081201095001001EF760



**Document ID: 2008081201095001** Document Date: 07-23-2008 Preparation Date: 08-12-2008
Document Type: MORTGAGE
Document Page Count: 17

**PRESENTER:**
RICHMOND COMMUNITY TITLE & ABSTRACT
COMPANY, LLC
TEAM PICK-UP - RCT08-0036-K
2040 VICTORY BOULEVARD
STATEN ISLAND, NY 10314
718-697-2740

**RETURN TO:**
FINANCIAL FREEDOM SENIOR FUNDING CORP.
A SUBSIDIARY OF INDYMAC BANK, F.S.B.
192 TECHNOLOGY PKWY, SUITE 100
NORCROSS, GA 30092

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 8640 | 54 | Entire Lot | | 2434 EAST 66TH STREET |

**Property Type:** DWELLING ONLY - 1 FAMILY

**CROSS REFERENCE DATA**

CRFN______ *or* Document ID________ *or* ______ Year____ Reel ___ Page____ *or* File Number________

**PARTIES**

**MORTGAGOR/BORROWER:**
RITA RAAB
2434 E 66TH STREET
BROOKLYN, NY 11234

**MORTGAGEE/LENDER:**
FINANCIAL FREEDOM SENIOR FUNDING
CORPORATION
192 TECHNOLOGY PKWY, SUITE 100
NORCROSS, GA 30092

**FEES AND TAXES**

| **Mortgage** | | |
|---|---|---|
| Mortgage Amount: | $ | 1,087,900.00 |
| Taxable Mortgage Amount: | $ | 0.00 |
| Exemption: | | 253 |
| TAXES: County (Basic): | $ | 0.00 |
| City (Additional): | $ | 0.00 |
| Spec (Additional): | $ | 0.00 |
| TASF: | $ | 0.00 |
| MTA: | $ | 0.00 |
| NYCTA: | $ | 0.00 |
| Additional MRT: | $ | 0.00 |
| TOTAL: | $ | 0.00 |
| Recording Fee: | $ | 122.00 |
| Affidavit Fee: | $ | 8.00 |

| | | |
|---|---|---|
| Filing Fee: | $ | 0.00 |
| NYC Real Property Transfer Tax: | $ | 0.00 |
| NYS Real Estate Transfer Tax: | $ | 0.00 |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**
Recorded/Filed 08-14-2008 09:55
City Register File No.(CRFN):
**2008000325175**

***City Register Official Signature***

[redacted]

This Document Prepared by:
**FINANCIAL FREEDOM SENIOR FUNDING CORPORATION , A SUBSIDIARY OF INDYMAC BANK, F.S.B.**
**192 TECHNOLOGY PKWY, SUITE 100**
**NORCROSS , GEORGIA 30092**

When Recorded Mail to:
**FINANCIAL FREEDOM SENIOR FUNDING CORPORATION , A SUBSIDIARY OF INDYMAC BANK, F.S.B.**
**192 TECHNOLOGY PKWY, SUITE 100**
**NORCROSS, GEORGIA 30092**

[Space Above This Line For Recording Data]

LOAN NO: [redacted]

# NEW YORK REVERSE MORTGAGE

**THIS MORTGAGE SECURES AN OPEN-END (REVOLVING) LINE OF CREDIT WHICH PROVIDES FOR PAYMENTS, FUTURE ADVANCES AND A VARIABLE RATE OF INTEREST AS SET FORTH IN A CASH ACCOUNT ADVANTAGE ADJUSTABLE RATE REVERSE MORTGAGE LOAN ACCOUNT DISCLOSURE STATEMENT AND AGREEMENT DATED THE SAME DATE AS THIS MORTGAGE ("AGREEMENT"). THE PROVISIONS OF THE AGREEMENT ARE INCORPORATED HEREIN BY THIS REFERENCE.**

THIS MORTGAGE ("Security Instrument") is made on **JULY 23, 2008** . The Borrower is
**Rita Raab**

2434 E 66th St., Bklyn., NY.

("Borrower") (unless the context indicates otherwise, the terms "Borrower", "I", "we", "us", "me", "my", "mine" and "our" refer collectively to all Borrowers under this Security Instrument). The Lender is
**FINANCIAL FREEDOM SENIOR FUNDING CORPORATION , A SUBSIDIARY OF INDYMAC BANK, F.S.B.** ,
**A DELAWARE CORPORATION** , whose office address is
**192 TECHNOLOGY PKWY, SUITE 100, NORCROSS, GEORGIA 30092**

("Lender") (unless the context indicates otherwise, the terms "Lender", "you" and "your" refer to
**FINANCIAL FREEDOM SENIOR FUNDING CORPORATION , A SUBSIDIARY OF INDYMAC BANK, F.S.B.** ).
"Loan" and "Account" refer to the debt evidenced by the Agreement. Borrower owes Lender a maximum principal sum of
**ONE MILLION EIGHTY SEVEN THOUSAND NINE HUNDRED AND 00/100** --------------------------------------------------------------------------------------------------------
**(U.S. $ 1,087,900.00** ), plus all interest and other amounts due as set forth below.

This debt is evidenced by the Agreement, which provides for a single payment due and payable in the ordinary course, upon the earliest to occur of any of the Maturity Events as set forth more fully in Section 6 of the Agreement, which are as follows: (a) the sale, conveyance, transfer or assignment of any part of the Property, as defined below, or any of Borrower's rights in the Property, whether voluntarily or involuntarily, by operation of law or otherwise, to a person other than any of the original Borrowers, without Lender's prior written consent, (b) the



[redacted]

[redacted]

Borrower's death or, if there is more than one Borrower, the death of the last living Borrower; and (c) all Borrowers ceasing to use the Property as their principal residence.

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to: (a) pay all the amounts that I owe Lender as stated in the Agreement (b) pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 of this Security Instrument to protect the value of the Property and Lender's rights in the Property; and (c) keep all of my other promises and agreements under this Security Instrument.

The amounts described above sometimes will be called the "Sums Secured."

**DESCRIPTION OF THE PROPERTY**

I give Lender rights in the Property described in (a) through (g) below: (a) the Property which is located at

**2434 E 66TH ST**
[Street]

**BROOKLYN** , New York **11234** . This Property is in
[City] [Zip Code]

**KINGS** County. It has the following legal description:

[See Exhibit "A" attached hereto.]

(b) all buildings and other improvements that are located on the Property described in subparagraph (a) of this section; (c) all rights in other property that I have as owner of Property described in subparagraph (a) of this section. These rights are known as "easements and appurtenances attached to the Property"; (d) all rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subparagraph (a) of this section; (e) all fixtures that are now or in the future will be on the Property described in subparagraphs (a) and (b) of this section; (f) all of the rights and property described in subparagraphs (b) through (e) of this section that I acquire in the future; and (g) all replacements of or additions to the Property described in subparagraphs (b) through (f) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (a) I lawfully own the Property; (b) I have the right to mortgage, grant and convey the Property to Lender; and (c) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains promises and agreements that vary, to a limited extent, in different parts of the country. My promises and agreements are stated in "plain language."

**CREDIT LINE MORTGAGE**

This Security Instrument secures the debt described in the Agreement and contemplates a series of advances which will be advanced from time to time from and after the date of this Security Instrument not to exceed in the aggregate at any one time the maximum principal amount stated in the Agreement. Amounts of money borrowed from time to time under the Loan Agreement and paid to Borrower or on Borrower's behalf by Lender are called "Loan Advances."



[redacted]

Prem is improved by a one family dwelling.

SCHEDULE A

DESCRIPTION

Title Number: [redacted]

**BLOCK: 8640 LOT: 54**

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Westerly side of East 66th Street distant along the arc of said street as hereinafter described 270.01 feet Southerly from the corner formed by the intersection of the Westerly side of East 66th Street with the Southerly side of MacMullen Drive North;

RUNNING THENCE Southerly along the Westerly side of East 66th Street on an arc whose radius is 1815.58 feet and whose chord lies West of said arc a distance of 54.50 feet;

THENCE Westerly on a line forming a radius of the circle of which said arc of East 66th Street is a part 100 feet to the center line of the block between East 65th Street and East 66th Street;

THENCE Northerly along said center line of the block between East 65th Street and 66th Street on an arc whose radius is 1715.58 feet and whose chord lies West of said are eight distance of 51.50 feet;

THENCE Easterly along a line forming a radius of the circle of which the arc of East 66th Street is a part 100 feet to the Westerly side of East 66th Street at the point or place of BEGINNING.

Said premises being known as and by street address 2434 East 66th Street, Brooklyn, NY 11234.

[redacted]

COVENANTS. I promise and I agree with Lender as follows:

1. **Borrower's Promise to Pay.**
   I will pay to Lender on time principal and interest due under the Agreement and any fees, charges and other amounts due under the Agreement.
2. **Monthly Payments for Taxes and Insurance.**
   I will pay all taxes, assessments, water frontage charges and other similar charges, sewer rents, leasehold payments or ground rents (if any), premiums for hazard or property insurance covering the Property, and flood insurance (if any) (the "Property Charges") when they are due until the Agreement is paid in full. Under the Loan Agreement, however, I can elect to have Lender pay these Property Charges out of Loan Advances.
3. **Application of Borrower's Payments.**
   Unless the law requires otherwise, Lender will apply each of my payments under the Agreement and under Paragraph 1 above in the following order and for the following purposes:
   First, to pay Capitalized Interest;
   Next, to pay principal due; and
   Last, to pay any fees, charges and other amounts due under the Agreement or this Security Agreement.

   "Capitalized Interest" is the amount of interest charged on the Loan Advances and added to the Loan Balance as a Loan Advance at the end of each month as well as any loan points, which are paid with a Loan Advance.
4. **Borrower's Obligation to Pay Charges, Assessments, Claims and Liens.**
   **(A) Borrower's Obligations to Pay Taxes.**
   I will pay all taxes, assessments, water frontage charges and other similar charges, sewer rents, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will do this either by telling Lender to pay them as described in Paragraph 2 above or by making the payments to the "person" owed them before they are due or on the date they are due and payable. (In this Security Instrument, the word "person" means any person, organization, governmental authority or other party.) If I make direct payments, then promptly after making any of those payments I will give Lender a receipt which shows that I have done so. If I tell Lender to pay them under Paragraph 2, I will give Lender all notices or bills that I receive for the amounts due under this Paragraph 4.

   **(B) Borrower's Obligation to Pay Liens.**
   I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or (b) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced; or (c) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any party of the Property is subject to a superior lien, Lender may give Borrower a notice identifying the superior lien. Borrower shall pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.
5. **Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.**
   I will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage, including floods and flooding. The insurance must be in the amounts and for the periods of time required by Lender. I will pay the costs and premiums for that insurance before the date the premiums are due or on the date they are due and payable or I will tell Lender to pay them as described in Paragraph 2 above. I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not



[redacted]

[redacted]

refuse to approve my choice unless the refusal is reasonable. If I do not maintain the insurance coverage described above, Lender may obtain insurance coverage to protect Lender's rights in the Property in accordance with Paragraph 7 below.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgagee clause" to protect Lender. The form of all polices and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; or (b) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that I owe to Lender under the Agreement and under this Security Instrument. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, of if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If Lender acquires the Property under Paragraph 21 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

6. **Borrower's Obligations to Occupy the Property, to Maintain and Protect the Property, and to Fulfill Any Lease Obligations; Borrower's Loan Application.**

**(A) Borrower's Obligations to Occupy the Property.**

I will occupy the Property and use the Property as my principal residence at all times. This means I will actually live in the house on the Property. I can have only one principal residence at any one time. If Lender asks, I will tell Lender in writing whether or not the Property is my principal residence.

**(B) Borrower's Obligations to Maintain and Protect the Property.**

I will keep the Property in good repair. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate.

I will be "in default" under this Security Instrument if I fail to keep any promise or agreement made in this Security Instrument. I also will be in default under this Security Instrument if any civil or criminal action or proceeding for "forfeiture" (that is, legal action or proceeding to require the Property, or any part of the Property, to be given up) is begun and Lender determines, in good faith, that this action or proceeding could result in a court ruling (i) that would require forfeiture of the Property or (ii) that would materially impair the lien of this Security Instrument or Lender's rights in the Property. I may correct the default by obtaining a court ruling that dismisses the legal action or proceeding, if Lender determines, in good faith, that this court



[redacted]

[redacted]

ruling prevents forfeiture of my interests in the Property and also prevents any material impairment of (i) the lien created by this Security Instrument or (ii) Lender's rights in the Property. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Paragraph 18 below, even if Lender has required immediate payment in full.

**(C) Borrower's Obligations to Fulfill Any Lease Obligations.**

If I do not own but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

**(D) Borrower's Loan Application.**

If, during the application process for the loan that I promise to pay under the Agreement, I made false or inaccurate statements to Lender about information important to Lender in determining my eligibility for the loan, Lender will treat my actions as a default under this Security Instrument. False or inaccurate statements about information important to Lender would include a misrepresentation of my intentions to occupy the Property as a principal residence. This is just one example of a false or inaccurate statement of important information. Also, if during the loan application process I failed to provide Lender with information important to Lender in determining my eligibility for the loan, Lender will treat this as default under this Security Instrument.

7. **Lender's Right to Protect Its Rights in the Property.**

If: (a) I do not keep my promises and agreements made in this Security Instrument, or (b) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or forfeiture, or to enforce laws or regulations), Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 7, Lender does not have to do so.

I will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 7. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the rate of interest provided in the Agreement. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this paragraph. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

8. **First Lien on the Property.**

This Security Instrument is a first lien on the Property. I will keep this Security Instrument as a first lien on the Property. Lender may do and pay whatever is necessary to keep and protect this Security Instrument as a first lien on the Property. If Lender determines that the first lien status of this Security Instrument is at risk or threatened because (a) the total Loan Advances will be more than the maximum amount stated in this Security Instrument, or (b) any part of the loan will not have first lien status under applicable state law, or (c) applicable state law prevents Lender from making further Loan Advances as a first lien, then I will execute any documents prepared by Lender to extend the first lien status to an additional maximum loan amount or an additional number of years or otherwise to make possible further Loan Advances secured by a first lien. Lender does not have to take any of the steps described in this Paragraph if the Loan Advances will not be a first lien. If additional Loan Advances will not be provided first lien status under state law, then I will be in default under this Security Instrument. I will not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

9. **Lender's Right to Inspect the Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.



[redacted]

[redacted]

**10. Condemnation of the Property.**
I hereby assign to you the proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, and the same are to be paid to you.

In the event of a total taking of the Property or a conveyance in lieu of condemnation, the proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to me. If the Property is partially taken and the fair market value of the Property (as determined pursuant to Section 10a below) immediately before the taking is equal to or greater than the sums secured by this Security Instrument immediately before the taking, unless you and I otherwise agree in writing, the sums this Security Instrument secures will be reduced by applying thereto a portion of the proceeds equal to the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking as so determined. Any balance will be paid to me. If the Property is partially taken and the fair market value of the Property (as determined pursuant to Section 10a below) immediately before the taking is less than the amounts secured immediately before the taking, unless you and I agree otherwise in writing or unless applicable law otherwise provides, the proceeds will be applied to the sums secured by this Security Instrument, whether or not they are then due.

If I abandon the Property or if, after you notify me that the condemnor has offered to make an award or settle a claim for damages, I fail to respond to you within thirty (30) days after the date the notice is given, you are authorized to collect and apply the proceeds, at your option, either to restore or repair the Property or to the amounts secured by this Security Instrument, whether or not they are then due.

**a.** In the event of a partial taking, the Property's fair market value shall be determined by one or two real estate appraisers certified either as a Senior Residential Appraiser of the Society of Real Estate Appraisers or a Residential Member of the American Institute of Real Estate Appraisers in accordance with the following procedure. Lender shall select an appraiser who will determine the fair market value of the Property as of the Maturity Event in accordance with the general practice of the Society of Real Estate Appraisers or the American Institute of Real Estate Appraisers, as the case may be, and provide a written appraisal reflecting this determination to Lender (the "Lender Appraisal"). Lender shall submit to me a copy of the Lender Appraisal along with notice of my right to dispute the appraiser's determination of the fair market value of the Property which will include a list of no less than three (3) additional appraisers approved by Lender ("Notice of Right to Object"). The determination of fair market value of the Property reflected in the Lender Appraisal shall be conclusive unless I provide to Lender a Notice of Objection & Selection of Appraiser, as defined below, within fourteen (14) calendar days of the date Lender sends me the Lender Appraisal and Notice of Right to Object.

If I wish to contest the fair market value determination reflected in the Lender Appraisal, I will provide Lender both (i) a written statement of my objection to the Lender Appraisal, and (ii) my written selection of one of the appraisers approved by Lender and listed in the Notice of Right to Object (collectively referred to herein as the "Notice of Objection & Selection of Appraiser"). If my Notice of Objection & Selection of Appraiser does not clearly state my selection of an appraiser listed in the Notice of Right to Object, you may elect to select an appraiser from such list. If the appraiser I select or you select is unable to complete the appraisal of the Property, a replacement appraiser shall be selected by you from the list of approved appraisers in the Notice of Right to Object. The appraiser selected shall independently determine the fair market value of the Property as of the Maturity Event in accordance with the general practice of the Society of Real Estate Appraisers or the American Institute of Real Estate Appraisers, as the case may be. The appraiser shall promptly submit the written appraisal of the fair market value of the Property to Lender. Lender shall average the two appraisals



[redacted]

[redacted]

and this average shall be the fair market value of the Property as of the Maturity Event. Lender shall provide me a copy of the second appraisal and notice of its calculation of the average of the two appraisals.

The appraisal procedure of determining the fair market value of the Property set forth above is referred to in this Addendum as the "Standard Appraisal Method" and shall be used whenever an appraisal is necessary to determine the amount I owe you under the Agreement. I agree that the determination of the Property's fair market value pursuant to the Standard Appraisal Procedure will be fair and shall be final and binding on me.

I shall pay all costs associated with any appraisal of the Property pursuant to the Standard Appraisal Method and shall reimburse you for any amounts you spend in connection with such an appraisal, except to the extent prohibited by law. Amounts you spend shall become additional indebtedness under the Agreement and shall be secured by the Security Instrument, shall be deemed an Advance and shall be due and payable by me upon your demand.

**11. Continuation of Borrower's Obligations and of Lender's Rights.**

**(A) Borrower's Obligations.**

Lender may allow a person who takes over my rights and obligations to delay the payment of principal and interest due under the Agreement or under this Security Instrument. Even if Lender does this, however, that person and I will both still by fully obligated under the Agreement and under this Security Instrument.

Lender may allow those delays for a person who takes over my rights and obligations even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Agreement or under this Security Instrument, even if Lender is requested to do so.

**(B) Lender's Rights.**

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 21 below to demand that I make immediate payment in full of the amount that I owe to Lender under the Agreement and under this Security Instrument.

**12. Obligations of Borrower and of Persons Taking Over Borrower's Rights or Obligations.**

Any person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Agreement: (a) that person is signing this Security Instrument only to give that person's rights in the Property to Lender under the terms of this Security Instrument; and (b) that person is not personally obligated to pay the Sums Secured; and (c) that person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of this Security Instrument or the Agreement without that person's consent.



[redacted]

[redacted]

13. **Loan Charges.**
If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Agreement.

14. **Notices Required Under This Security Instrument.**
Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at the address stated in section above titled "Description of the Property." A notice will be given to me at a different address if I give Lender or Lender's successor or assign a notice of my different address. Any notice that must be given to Lender under this Security Instrument will be given by mailing it to Lender's address stated on the first page of this document. A notice will be mailed to Lender or Lender's successor or assign at a different address if Lender or Lender's successor or assign gives me notice of the different address. A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

15. **Law That Governs This Security Instrument.**
This Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Security Instrument, the Agreement conflicts with the law, all other terms of this Security Instrument, the Agreement will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Security Instrument, or of the Agreement which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

16. **Borrower's Copy.**
I will be given one conformed copy of the Agreement and of this Security Instrument.

17. **Repayment of Debt on Death Or Sale.**
**(A) Death or Sale.**
Lender will require immediate payment in full of all Sums Secured by this Security Instrument if: (i) I die and the Property is not the principal residence of at least one surviving Borrower, or (ii) I voluntarily or involuntarily convey all or any part of the title to the Property and no other Borrower retains fee simple title to the Property, or (iii) if I do not own but I am a tenant on the Property, I voluntarily or involuntarily convey my tenant rights in the Property and no other Borrower retains tenant rights in the Property.

**(B) Not Principal Residence.**
Lender will require immediate payment in full of all Sums Secured by this Security Instrument if: (i) the Property ceases to be my principal residence for reasons other than death and the Property is not then the principal residence of at least one other Borrower, or (ii) for a period of longer than twelve (12) consecutive months, I fail to actually live in the Property for any reason and the Property is not the principal residence of at least one other Borrower.



[redacted]

[redacted]

**(C) Trusts.**

If I convey my interest in the Property to a trust which meets the customary requirements of Lender, or that trust conveys its interest in the Property to me, these events do not violate this Paragraph 17.

**(D) Notice of Immediate Payment in Full.**

If one or more of the Events in Paragraph 17(A) or (B) occurs, Lender will give me a notice requiring immediate payment in full of all Sums Secured. If I do not make the required payment on the date the notice is mailed or delivered, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**18. Borrower's Right to Have Lender's Enforcement of This Security Instrument Discontinued.**

Except as provided in Paragraph 17 above, even if Lender has required immediate payment in full, I may have the right to have enforcement of this Security Instrument discontinued. I will have this right at any time before sale of the Property under any power of sale granted by this Security Instrument or at any time before a judgment has been entered enforcing this Security Instrument if I meet the following conditions: (a) I pay to Lender the full amount that then would be due under this Security Instrument and the Agreement as if immediate payment in full had never been required; and (b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument; and (c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees; and (d) I do whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Security Instrument, and my obligations under the Agreement and under this Security Instrument continue unchanged.

If I fulfill all of the conditions in this Paragraph 18, then the Agreement and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under Paragraph 17 above.

**19. Lender's Right to Sell the Agreement or an Interest in the Agreement; Borrower's Right to Notice of Change of Loan Servicer.**

The Agreement, or an interest in the Agreement, together with this Security Instrument, may be sold one or more times. I may not receive any prior notice of these sales. Any person who takes over Lender's rights or obligations under this Security Instrument is known as "Lender's successor or assign" and will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

The entity that I deal with about the Agreement and this Security Instrument is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Agreement; there also may be one or more changes of the Loan Servicer unrelated to a sale of the Agreement. The law requires that I be given written notice of any change of the Loan Servicer. The written notice must be given in the manner required under Paragraph 14 above and under applicable law. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by the law.

**20. Continuation of Borrower's Obligations to Maintain and Protect the Property.**

The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection are called "Environmental Laws." I will not do anything affecting the Property that violates Environmental Laws, and I will not allow anyone else to do so.

Environmental Laws classify certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Paragraph 20. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental



[redacted]

[redacted]

Laws and the substances considered hazardous for purposes of this Paragraph 20 are called "Hazardous Substances."

I will not permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property, and I will not allow anyone else to do so. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. However, I may permit the presence on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and I may use or store these small quantities on the Property. In addition, unless the law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

If I know of any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws, I will promptly notify the Lender in writing. If the government notifies me (or I otherwise learn) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, I will promptly take all necessary remedial actions as required by Environmental Laws.

**21. Lender's Rights if Borrower Fails to Keep Promises and Agreements.**

Except as provided in Paragraph 17 above, if all of the conditions stated in subparagraphs (a), (b) and (c) of this Paragraph 21 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Agreement and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require immediate payment in full under this Paragraph 21 only if all of the following conditions are met:

(A) I fail to keep any promise or agreement made in this Security Instrument, the Agreement, including the promises to pay when due the Sums Secured.

(B) Lender sends to me, in the manner described in Paragraph 14 above, a notice that states: (i) the promise or agreement that I failed to keep; ii) the action that I must take to correct that default; iii) a date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given; iv) that if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or another person may acquire the Property by means of foreclosure and sale; v) that if I meet the conditions stated in Paragraph 18 above, I will have the right to have Lender's enforcement of this Security Instrument discontinued and to have the Agreement and this Security Instrument remain fully effective as if immediate payment in full had never been required; and vi) that I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Agreement and under this Security Instrument, and to present any other defense that I may have.

(C) I do not correct the default stated in the notice from Lender by the date stated in that notice.



[redacted]

[redacted]

**22. Lender's Obligation to Discharge this Security Instrument.**

When Lender has been paid all amounts due under the Agreement and this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recoding the discharge in the proper official records.

**23. Agreements about New York Lien Law**

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that if, on the date this Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Agreement as a "trust fund"; and (b) use those amounts to pay for that construction or work before I use them for any other purpose. The fact that I am holding those amounts as a "trust fund" means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Paragraph 23.

**24. Non-Recourse Liability.**

If Lender requires immediate payment in full, Lender may enforce the obligation under this Security Instrument and the Loan Agreement only by foreclosure and sale of the Property. Lender can have the Property sold and I may lose all my rights in the Property to pay the Sums Secured . I will not lose any other property or rights like cash, bank accounts, or cars, to pay the Sums Secured. I have no personal liability for payment of the amounts due under this Security Instrument and the Agreement.

**25. Severability.**

A determination that any provision of this Mortgage is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Mortgage to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

**26. Adjustable Rate Feature.**

Under the Agreement, the initial stated interest rate which accrues on the unpaid principal balance ("Initial Interest Rate") is subject to change, as described below.

**(A) Variable Rate.**

The interest rate which accrues on the unpaid principal balance will be a variable rate, which may change semi-annually. Except for the Initial Interest Rate, the rate will be the sum of the Index rate plus **THREE AND 750/1000** percentage points ( **3.75000** %) (the "Margin").

**(B) Initial Interest Rate.**

My initial interest rate will be a discounted rate. This means that the interest rate beginning on the date my Account is opened will be lower than it would have been if it were based on the Index plus Margin. As a result of the discounted initial interest rate, my rate likely will increase upon the First Change Date even if the Index rate decreases.

**(C) Rate Change Date.**

After my Account is opened, the interest rate may change of the first day of the billing cycle beginning on or after **JANUARY, 2009** and on the first day of every sixth billing cycle thereafter. Each day on which my interest rate could change is called a "Rate Change Date".

**(D) Index.**

Beginning with the first Rate Change Date, the interest rate on my Account will be adjusted to equal the Current Index plus the Margin. The most recent Index rate available as of the last business day immediately preceding the Change Date is called the "Current Index." The Index rate applicable to my Account will be the



[redacted]

[redacted]

average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* If the Index becomes unavailable, you will choose a new Index and Margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and Margin will result in an interest rate that is substantially similar to the rate in effect at the time the original Index becomes unavailable. You will provide me with written notice of the unavailability of the original Index, and of the new Index and its effective date.

**(E) Increase in Index.**
The new interest rate will apply to new Advances and charges, and to the existing unpaid balance of my Account.

**(F) Maximum Annual Percentage Rate.**
The interest rate can change semi-annually. Maximum Annual Percentage Rate that could apply is listed on the first page of the Agreement. The Initial Discounted Interest Rate is not taken into account in calculating the Maximum Annual Percentage Rate limitation. Except for this "cap", there is no limit on the amount by which the rate can change.

**27. Copy of Notice of Foreclosure and Sale**
If Lender intends to start a lawsuit for foreclosure and sale of the Property, I request that Lender notify this person: ______________________________
[Name and address of person]

**28. Riders to this Security Instrument.**
If one or more riders are signed by Borrower and recorded together with this Security Instrument, the promises and agreements of each rider are incorporated as a part of this Security Instrument. [Check Applicable box(es)]:

[ ] Condominium Rider [ ] Planned Unit Development Rider

[ ] 1-4 Family Rider [ ] Other:



[redacted]

[redacted]

BY SIGNING UNDER SEAL BELOW, I accept and agree to the promises and agreements contained in pages 1 through 14 of this Security Instrument and in any rider(s) signed by me and recorded with it.

BORROWER:

_______________________________ (Seal)
RITA RAAB -Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower

_______________________________ (Seal)
-Borrower



[redacted]

[redacted]

State of New York
County of Kings

On July 23, 2008, before me, Susan Poli, personally appeared
Rita Raab

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Susan Poli
(Signature and office of individual taking acknowledgment)

SUSAN POLI
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01PO6090199
QUALIFIED IN RICHMOND COUNTY
COMMISSION EXPIRES 4/7/11

SEAL



[redacted]

[redacted]

**Exhibit "A"**

Legal description of Property:
**legal description attached**

Borrower's Initials    Borrower's Initials



[redacted]

Loan Number: [redacted]
Lender: FIN[redacted]EDOM SENIOR FUNDING CORPORATION, A SUBSIDIARY OF INDY MAC BANK, F.S.B.
Borrower: RITA RAAB

Property Address: 2434 E 66TH ST, BROOKLYN, NEW YORK 11234

# NEW YORK MORTGAGE TAX AFFIDAVIT
## (Reverse Mortgage)

**State of New York** } ss.
**County of KINGS** }

Michael M. Menicucci being duly sworn, deposes and says that I am a duly authorized agent of **FINANCIAL FREEDOM SENIOR FUNDING CORPORATION, A SUBSIDIARY OF INDY MAC BANK, F.S.B.**,
the owner and holder of the hereinafter described mortgage which is being submitted for recording. I am familiar with the facts set forth herein.

That a certain mortgage, dated **JULY 23, 2008**, for property located at and known as Tax Lot 54 ______, in Block 8440 on the Tax Map of the ______ of **KINGS** County, in the amount of **$ 1,087,900.00** was made by
**RITA RAAB**

to **FINANCIAL FREEDOM SENIOR FUNDING CORPORATION, A SUBSIDIARY OF INDY MAC BANK, F.S.B.**.

That the mortgage is a reverse mortgage that is given by a mortgagor who is or mortgagors all of which who are at least (mark the appropriate box) ☐ 60 or ☒ 70 years of age;

That the mortgage is a reverse mortgage of real property improved by a one-to-four family residence or condominium unit that is the residence of the mortgagor or mortgagors;

That the mortgage is a reverse mortgage that conforms to all other provisions of Section 280 of the Real Property Law and, therefore, is exempt pursuant to section 280 (or, if applicable, section 280-A) of the Real Property Law and exempt from the mortgage recording taxes pursuant to section 252-a.2 of the Tax Laws.

The deponent respectfully requests that this reverse mortgage tendered herewith for recording be declared exempt from taxation pursuant to the provisions of Section 252-a.2 of Article 11 of the Tax Laws of the State of New York.

Print Name: Michael M. Menicucci

By: [signature]

Its: Settlement Agent

Sworn to before me this 23 day of July 2008.

[signature] Marie Bonacorsi
Notary Public

MARIE BONACORSI
Notary Public, State of New York
No. 01BO4807701
Qualified in Richmond County
Commission Expires December 31, 2010

My commission expires: Dec. 31, 2010

First American Loan Production Services
© 2008 First American Real Estate Solutions LLC
36WX : 01/08

New York Mortgage Tax Affidavit-Reverse

SEAL

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

[redacted]

2009090101541001002EE6BC

**RECORDING AND ENDORSEMENT COVER PAGE** 

**Document ID: 2009090101541001** Document Date: 09-28-2009 Preparation Date: 10-01-2009

Document Type: ASSIGNMENT, MORTGAGE

Document Page Count: 1

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| NATIONWIDE TITLE CLEARING<br>2100 ALT 19 NORTH<br>PALM HARBOR, FL 34683<br>727-771-4000<br>jessica_lesinski@nwtc.com | NATIONWIDE TITLE CLEARING<br>2100 ALT 19 NORTH<br>PALM HARBOR, FL 34683<br>727-771-4000<br>jessica_lesinski@nwtc.com |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 8640 | 54 | Entire Lot | | 2434 EAST 66TH STREET |

**Property Type:** 1- 2 FAM WITH ATTCH GAR &/OR VACANT LAND

**CROSS REFERENCE DATA**

**CRFN:** 2008000325175

**PARTIES**

| **ASSIGNOR/OLD LENDER:** | **ASSIGNEE/NEW LENDER:** |
|---|---|
| FINANCIAL FREEDOM SENIOR FUNDING CORPORATION<br>190 TECHNOLOGY PARKWAY, SUITE 100<br>NORCROSS, GA 30092 | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC<br>3300 SW 34TH AVENUE, SUITE 101<br>OCALA, FL 34474 |

**FEES AND TAXES**

**Mortgage**

| | | |
|---|---|---|
| Mortgage Amount: | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 |
| Exemption: | | |
| TAXES: County (Basic): | $ | 0.00 |
| City (Additional): | $ | 0.00 |
| Spec (Additional): | $ | 0.00 |
| TASF: | $ | 0.00 |
| MTA: | $ | 0.00 |
| NYCTA: | $ | 0.00 |
| Additional MRT: | $ | 0.00 |
| TOTAL: | $ | 0.00 |
| Recording Fee: | $ | 42.00 |
| Affidavit Fee: | $ | 0.00 |

| | | |
|---|---|---|
| Filing Fee: | $ | 0.00 |
| NYC Real Property Transfer Tax: | $ | 0.00 |
| NYS Real Estate Transfer Tax: | $ | 0.00 |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed 10-09-2009 10:50

City Register File No.(CRFN):

**2009000329581**

***City Register Official Signature***

**Loan #**[redacted]
**Effective Date: 05/01/2009**

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **FINANCIAL FREEDOM SENIOR FUNDING CORPORATION, WHOSE ADDRESS IS 190 TECHNOLOGY PARKWAY SUITE 100 , NORCROSS, GA 30092** by these presents does convey, grant, sell, assign, transfer and set over the described mortgage together with the certain note(s) described therein together with all interest secured thereby, all liens, and any rights due or to become due thereon to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), A DELAWARE CORPORATION, ITS SUCCESSORS OR ASSIGNS, AS NOMINEE FOR FINANCIAL FREEDOM ACQUISITION LLC, P.O. BOX 2026, FLINT, MI 48501-2026, (ASSIGNEE)**
MERS Address: Mortgage Electronic Registration Systems, Inc., 3300 S.W. 34th Avenue, Suite 101, Ocala, FL 34474

Mortgage dated 07/23/2008, made by **RITA RAAB** to **FINANCIAL FREEDOM SENIOR FUNDING CORPORATION, A SUBSIDIARY OF INDYMAC BANK, F.S.B.** in the principal sum of $1,087,900.00 and recorded on 08/14/2008 in Liber page , CRFN # 2008000325175 in the office of the Registry of KINGS County, N.Y.

Prop Addr: 2434 E 66TH ST
BROOKLYN, NY 11234
This mortgage(s) has not been assigned of record.
This Assignment is not subject to the requirements of section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.
THE FOREGOING ASSIGNMENT IS MADE WITHOUT RECOURSE, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, BY FINANCIAL FREEDOM SENIOR FUNDING CORPORATION.
**Dated:THIS 28TH DAY OF SEPTEMBER IN THE YEAR 2009**
**FINANCIAL FREEDOM SENIOR FUNDING CORPORATION**

By ______________________
**CRYSTAL MOORE VICE PRESIDENT**

By ______________________
**VILMA CASTRO witness**

STATE OF FLORIDA COUNTY OF PINELLAS
THIS 28TH DAY OF SEPTEMBER IN THE YEAR 2009, before me, the undersigned, personally appeared CRYSTAL MOORE, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in PINELLAS County, State of FLORIDA

______________________
CHRISTOPHER JONES Notary Public
Residing in the county of PINELLAS
My commission expires:

Christopher Jones
Notary Public, State of Florida
Commission # DD 811078
Expires August 03, 2012
Bonded Through National Notary Assn.

SEAL

**Document Prepared By: Jessica Fretwell/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
Property ID(S/B/L): B: 8640, L: 54
Return by Mail to: Financial Freedom
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

[redacted] $42.00 MI[redacted]ERS PHONE
1-888-679-MERS
[redacted]

formS/FRMNY1

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

[redacted]

2015071600339001001E1E6E

**RECORDING AND ENDORSEMENT COVER PAGE** 

**Document ID: 2015071600339001** Document Date: 03-17-2015 Preparation Date: 07-16-2015
Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 3

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| CHARLES A BROWN AND ASSOC DBA<br>DOCSOLUTION<br>2316 SOUTHMORE AVE.<br>PASADENA, TX 77502 | CHARLES A BROWN AND ASSOC DBA<br>DOCSOLUTION<br>2316 SOUTHMORE AVE.<br>PASADENA, TX 77502 |

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 8640 | 54 | Entire Lot | | 2434 EAST 66th STREET |

**Property Type:** DWELLING ONLY - 1 FAMILY

**CROSS REFERENCE DATA**

**CRFN:** 2008000325175
☒ Additional Cross References on Continuation Page

**PARTIES**

| **ASSIGNOR/OLD LENDER:** | **ASSIGNEE/NEW LENDER:** |
|---|---|
| MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC<br>1901 E VOORHEES ST, STE C<br>DANVILLE, IL 61834 | ONEWEST BANK NA<br>2900 ESPERANZA CROSSING<br>AUSTIN, TX 78758 |

☒ Additional Parties Listed on Continuation Page

**FEES AND TAXES**

| **Mortgage :** | | |
|---|---|---|
| Mortgage Amount: | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 |
| Exemption: | | |
| TAXES: County (Basic): | $ | 0.00 |
| City (Additional): | $ | 0.00 |
| Spec (Additional): | $ | 0.00 |
| TASF: | $ | 0.00 |
| MTA: | $ | 0.00 |
| NYCTA: | $ | 0.00 |
| Additional MRT: | $ | 0.00 |
| TOTAL: | $ | 0.00 |
| Recording Fee: | $ | 55.00 |
| Affidavit Fee: | $ | 0.00 |

| | | |
|---|---|---|
| Filing Fee: | $ | 0.00 |
| NYC Real Property Transfer Tax: | $ | 0.00 |
| NYS Real Estate Transfer Tax: | $ | 0.00 |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed 07-22-2015 10:29
City Register File No.(CRFN):
**2015000251909**

*City Register Official Signature*

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

[redacted]

2015071600339001001C1CEE

**RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION)** **PAGE 2 OF 5**

**Document ID: 2015071600339001** Document Date: 03-17-2015 Preparation Date: 07-16-2015
Document Type: ASSIGNMENT, MORTGAGE

**CROSS REFERENCE DATA**
**CRFN:** 2009000329581

**PARTIES**

**ASSIGNOR/OLD LENDER:**
FINANCIAL FREEDOM ACQUISITION LLC
C/O MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS INC, 1901 E VOORHEES ST STE C
DANVILLE, IL 61834

Prepared by, Recording Requested By and Return to:
Jay Wiley
Brown & Associates
2316 Southmore
Pasadena, TX 77502

Loan [redacted]

# ASSIGNMENT OF MORTGAGE

Min: [redacted] MERS Phone: 1-888-679-6377

***FOR VALUE RECEIVED,*** **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FINANCIAL FREEDOM ACQUISITION LLC, ITS SUCCESSORS AND ASSIGNS,** whose address is MERS, P.O. Box 2026, Flint, MI 48501-2026 and whose physical address is 1901 E Voorhees St, Ste C, Danville, IL 61834, does hereby assign and transfer to ONEWEST BANK N.A., ITS SUCCESSORS AND ASSIGNS, forever without recourse whose address is 2900 Esperanza Crossing, Austin, TX 78758, all its right, title and interest in and to the described Mortgage executed by **RITA RAAB** to **FINANCIAL FREEDOM SENIOR FUNDING CORPORATION, A SUBSIDIARY OF INDYMAC BANK, F.S.B.** for $1,087,900.00, dated 7/23/2008 of record on 8/14/2008 at Document Number 2008000325175, in the KINGS County Clerk's Office, State of NEW YORK.

Property Address: 2434 E 66TH ST, BROOKLYN, NEW YORK 11234
S/B/L: BLOCK 8640 LOT 54
Legal description: SEE THE ATTACHED EXHIBIT "A"
ASSIGNMENT RECORDED 10/09/2009 INSTRUMENT# 2009000329581 FROM FINANCIAL FREEDOM SENIOR FUNDING CORPORATION TO MERS AS A NOMINEE FOR FINANCIAL FREEDOM ACQUISITION LLC

Executed this MAR 17 2015.

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FINANCIAL FREEDOM ACQUISITION LLC, ITS SUCCESSORS AND ASSIGNS**

M Davis

By: MELINDA LEA DAVIS
Title: ASSISTANT SECRETARY

STATE OF TEXAS

COUNTY OF TRAVIS

On MAR 17 2015 , before me, the undersigned, personally appeared MELINDA LEA DAVIS the ASSISTANT SECRETARY of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., A DELAWARE CORPORATION, AS NOMINEE FOR FINANCIAL FREEDOM ACQUISITION LLC, ITS SUCCESSORS AND ASSIGNS personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of Austin , County of Travis, State of Texas.

Lutricia Carter

Notary Public in and for the State of Texas
Notary's Printed Name: LUTRICIA CARTER
My Commission Expires: 9/19/2017

NOTARY PUBLIC STATE OF TEXAS
LUTRICIA CARTER
My Commission Expires
September 19, 2017

For $1,087,900.00 dated 7/23/2008

This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the Secondary Mortgage Market.

SCHEDULE A

DESCRIPTION

BLOCK: 8640 LOT: 54

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Westerly side of East 66th Street distant along the arc of said street as hereinafter described 270.01 feet Southerly from the corner formed by the intersection of the Westerly side of East 66th Street with the Southerly side of MacMullen Drive North;

RUNNING THENCE Southerly along the Westerly side of East 66th Street on an arc whose radius is 1815.58 feet and whose chord lies West of said arc a distance of 54.50 feet;

THENCE Westerly on a line forming a radius of the circle of which said arc of East 66th Street is a part 100 feet to the center line of the block between East 65th Street and East 66th Street;

THENCE Northerly along said center line of the block between East 65th Street and 66th Street on an arc whose radius is 1715.58 feet and whose chord lies West of said are eight distance of 51.50 feet;

THENCE Easterly along a line forming a radius of the circle of which the arc of East 66th Street is a part 100 feet to the Westerly side of East 66th Street at the point or place of BEGINNING.

Said premises being known as and by street address 2434 East 66th Street, Brooklyn, NY 11234.

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

[redacted]

2018082900502001001ED917

## RECORDING AND ENDORSEMENT COVER PAGE



**Document ID: 2018082900502001** Document Date: 06-19-2018 Preparation Date: 08-29-2018
Document Type: ASSIGNMENT, MORTGAGE
Document Page Count: 2

| PRESENTER: | RETURN TO: |
|---|---|
| AMERICAN MORTGAGE CONSULTANTS<br>5120 W WATERS AVE<br>TAMPA, FL 33634<br>SUPPORT@SIMPLIFILE.COM | JAY WILEY<br>2316 SOUTHMORE<br>PASADENA, TX 77502<br>SUPPORT@SIMPLIFILE.COM |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 8640 | 54 | Entire Lot | | 2434 EAST 66TH STREET |

**Property Type:** DWELLING ONLY - 1 FAMILY

### CROSS REFERENCE DATA

**CRFN:** 2008000325175

### PARTIES

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| CIT BANK NA FKA ONEWEST FKA ONWEST<br>2900 ESPERANZA CROSSING<br>AUSTIN, TX 78758 | WILMINGTON SAVINGS FUND SOCIETY, FSB, NOT IN ITS I<br>1140 AVE OF THE AMERICAS 7TH FL<br>NEW YORK, NY 11234 |

### FEES AND TAXES

**Mortgage :**

| | | |
|---|---|---|
| Mortgage Amount: | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 |
| Exemption: | | |
| TAXES: County (Basic): | $ | 0.00 |
| City (Additional): | $ | 0.00 |
| Spec (Additional): | $ | 0.00 |
| TASF: | $ | 0.00 |
| MTA: | $ | 0.00 |
| NYCTA: | $ | 0.00 |
| Additional MRT: | $ | 0.00 |
| TOTAL: | $ | 0.00 |
| Recording Fee: | $ | 47.00 |
| Affidavit Fee: | $ | 0.00 |

| | | |
|---|---|---|
| Filing Fee: | $ | 0.00 |
| NYC Real Property Transfer Tax: | $ | 0.00 |
| NYS Real Estate Transfer Tax: | $ | 0.00 |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed 08-29-2018 14:16
City Register File No.(CRFN):
**2018000290709**

*City Register Official Signature*

Prepared by, Recording Requested By and Return to:
Jay Wiley
Brown & Associates
2316 Southmore
Pasadena, TX 77502

Client Id: Celink/AOL
Loan # [redacted]

Bill Code [redacted]

# ASSIGNMENT OF MORTGAGE

**FOR VALUE RECEIVED, CIT BANK, N.A. FKA ONEWEST BANK, N.A. FKA ONWEST BANK, FSB, ITS SUCCESSORS AND ASSIGNS**, whose address is 2900 Esperanza Crossing, Austin, TX 78758 does hereby assign and transfer to **WILMINGTON SAVINGS FUND SOCIETY, FSB, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY IN ITS CAPACITY AS OWNER TRUSTEE FOR CASCADE FUNDING RM1 ACQUISITIONS GRANTOR TRUST, ITS SUCCESSOR AND ASSIGNS** forever and without recourse, whose address is Cascade Funding, c/o Waterfall Asset Management, 1140 Avenue of the Americas, 7th Floor, New York, NY 10036 all its right, title and interest in and to the described Mortgage executed by RITA RAAB to FINANCIAL FREEDOM SENIOR FUNDING CORPORATION, A SUBSIDIARY OF INDYMAC BANK, F.S.B. for $1,087,900.00 dated 7/23/2008 of record on 8/14/2008 at Document Number 2008000325175, in the KINGS County Clerk's Office, State of NEW YORK.

Property Address: 2434 E 66TH ST, BROOKLYN, NEW YORK 11234
S/B/L: BLOCK 8640 LOT 54
ASSIGNMENT RECORDED 10/09/2009 INSTRUMENT# 2009000329581 FROM FINANCIAL FREEDOM SENIOR FUNDING CORPORATION TO MERS AS A NOMINEE FOR FINANCIAL FREEDOM ACQUISITION LLC

Executed this JUN 1 9 2018

CIT BANK, N.A. FKA ONEWEST BANK, N.A. FKA ONWEST BANK, FSB BY COMPU-LINK CORPORATION DBA CELINK AS ATTORNEY IN FACT

Desiree Byers

By: Desiree Byers
Title: Assistant Secretary

STATE OF TEXAS

COUNTY OF TRAVIS

Before me, the undersigned, a Notary Public on this day personally appeared Desiree Byers known to me (or proved to me on the oath of ______________), to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Compu-Link Corporation dba Celink as Attorney in Fact for CIT BANK, N.A. FKA ONEWEST BANK, N.A. FKA ONWEST BANK, FSB, ITS SUCCESSORS AND ASSIGNS, a corporation, and that he/she had executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office this _____ day of JUN 19 2018 A.D._______.

Terri Taylor

Notary Public in and for the State of Texas
Notary's Printed Name: Terri Taylor
My Commission Expires: NOV 19 2019

TERRI TAYLOR
Notary ID # 130446542
My Commission Expires
November 19, 2019

For $1,087,900.00 dated 7/23/2008

This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the Secondary Mortgage Market.